**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**
**www.flmb.uscourts.gov**

| | |
|---|---|
| In re: | Chapter 11 |
| CHS FL, LLC, *et al.*,[1] | Case No. 2:26-bk-01087-FMR |
| Debtor. | *Jointly Administered* |

/

**TEHUM CARE SERVICES, INC.'S, BY AND THROUGH MATTHEW J. DUNDON IN HIS CAPACITY AS THE WIND-DOWN OFFICER, AND MATTHEW J. DUNDON'S, IN HIS CAPACITY AS GUC TRUSTEE OF THE TEHUM GUC TRUST, <u>EMERGENCY MOTION TO TRANSFER VENUE TO THE SOUTHERN DISTRICT OF TEXAS</u>**

**[EMERGENCY HEARING REQUESTED]**

Tehum Care Services, Inc. by and through Matthew J. Dundon in his capacity as the Wind-Down Officer (the "<u>Wind-Down Officer</u>") and Matthew J. Dundon, in his capacity as GUC Trustee (the "<u>GUC Trustee</u>") of the Tehum GUC Trust (the "<u>GUC Trust</u>", and collectively with the Wind-Down Officer, the "<u>Movants</u>"), appointed and formed pursuant to the *First Modified Joint Chapter 11 Plan of Reorganization of the Tort Claimants' Committee, Official Committee of Unsecured Creditors, and Debtor* [Docket No. 2014, Ex. B] (the "<u>Plan</u>") in *In re Tehum Care Services, Inc.,* Case No. 23-90086 (Bankr. S.D. Tex.) (the "<u>Tehum Bankruptcy Case</u>"), which was confirmed by the United States Bankruptcy Court for the Southern District of Texas (the "<u>Texas Bankruptcy Court</u>") on March 3, 2025 [Tehum Bankruptcy Case, Docket No. 2014], by and through their undersigned counsel, hereby move on an expedited basis (the "<u>Motion</u>") for transfer of CHS FL, LLC's and its affiliated debtors' (the "<u>Debtors</u>") bankruptcy cases (the "<u>Chapter 11 Cases</u>") to the

---

[1] The address of the Lead Debtor is 3347 Tamiami Trail E., Naples, FL 34112. The last four digits of the Debtors' federal tax identification numbers are: (i) CHS FL, LLC (5547); (ii) YesCare Corp. (5961); (iii) CHS TX, Inc. (5886); and (iv) CHS AL, LLC (0801).

United States Bankruptcy Court for the Southern District of Texas in the interest of justice and for the convenience of the parties. In support of this Motion, Movants state as follows:

**PRELIMINARY STATEMENT**

1.      These Chapter 11 Cases are the latest in a seemingly endless scheme by former owners, officers and directors of Corizon to continue the same business of providing substandard care to patients at correctional facilities throughout the country while escaping liability for the damage caused by their bad acts.  These include damages for wrongful death, sexual assault, loss of limbs, severe pain and suffering, and more than $100 million owed to hospitals and other vendors who continued providing critical services for incarcerated individuals in reliance on Corizon's promises to honor its obligations.

2.      This attempt is not just to escape liability, but to flee the jurisdiction of the Texas Bankruptcy Court and evade the consequences of their own defaults under the confirmed Plan in the Tehum Bankruptcy Case.  On April 27, 2026, the GUC Trustee, the PI/WD Trustee, and the Post-Effective Date Debtor filed the Adversary Complaint against Isaac Lefkowitz, YesCare, CHS TX, Perigrove 1018, and various other Settlement Parties and their affiliates for claims including actual fraud, constructive fraud, breach of fiduciary duty, and alter ego and successor liability arising from the Divisional Merger and actions related thereto, as well to enforce a settlement obligation the Texas Bankruptcy Court's approval of which is final and non-appealable. Just eleven days later, the Debtors filed these Chapter 11 Cases in the Middle District of Florida—a district to which they have virtually no connection—to invoke the automatic stay and obstruct the prosecution of those claims in the Texas Bankruptcy Court.

3.      The Debtors' decision to file in this District cannot withstand scrutiny. None of the Debtors maintain their principal place of business in the Middle District of Florida; each of them

2

identifies 205 Powell Place, Suite 104, Brentwood, Tennessee as its principal place of business. YesCare Corp.'s website lists their headquarters in Texas.[2]  YesCare Corp. ("YesCare") and CHS AL, LLC ("CHS AL") are not even registered to do business in the State of Florida. The only link to this District is that CHS FL, LLC ("CHS FL") happens to be a Florida limited liability company—but even CHS FL's sole managing member is YesCare, a Texas corporation headquartered in Tennessee. The record is devoid of any evidence that CHS FL actually provides any services in Florida, has any employees in Florida, has any assets in Florida, or is anything other than a shell company with no actual assets, liabilities, or purpose.  The Debtors have not provided any valid or appropriate basis to support their choice of venue, and the timing of these filings, on the heels of the Adversary Complaint, speaks for itself.

4.      Movants seek to provide themselves and other creditors of the Debtors – including those whose obligations originated after the Divisional Merger, as defined below – with the benefit of administration of these cases by the Texas Bankruptcy Court and the United States Trustee for Region 7, each of which has a hard-earned expertise in the business of the Debtors and the character and complications of their ownership, as well as continuing jurisdiction over the Debtors' largest non-contingent and non-appealable liability, the over $35 million which they owe the Movants, discussed below. This imperative stands in contrast the lack of any material nexus between the Debtors, on the one hand, and the Middle District of Florida, on the other hand, also discussed in greater detail infra, and the great and unnecessary imposition the Debtors and their principals would impose upon the resources of this Court and of the United States Trustee for Region 21 to undertake the steep learning curve of this story.

---

[2] https://www.yescarecorp.com/choosing-yescare (Updated as of May 10, 2026 at 11:52 a.m. Eastern Time).

CORE/3533662.0002/242909810.4

5.      Meanwhile, the Texas Bankruptcy Court possesses an unparalleled familiarity with the parties, the facts, and the legal issues at the heart of these cases. That court has presided over the Tehum Bankruptcy Case for over three years, conducted multiple days of evidentiary hearings – including the testimony of Isaac Lefkowitz, the Manager of the Debtors and the individual who purportedly signed the corporate resolutions – overseen extensive investigations, approved the disclosure statement and confirmed the Plan, including the settlement with the Debtors contained therein. Pursuant to Article XII.A of the Plan, the Texas Bankruptcy Court expressly retained exclusive jurisdiction over all matters arising out of, or related to, the Tehum Bankruptcy Case and the Plan, including the authority to "adjudicate, decide, or resolve any and all matters related to the Plan (including the Estate Party Settlement)" and to "resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, implementation, interpretation, or enforcement of the Plan."   The Adversary Proceeding—which details Movants' claims against these very Debtors—is already pending before the Texas Bankruptcy Court.  The staff of the United States Trustee for Region 7 enjoys a similar advantage of experience in relation to these cases with respect to responsibilities of its office.

6.      Movants, and many similarly situated individuals and entities, are creditors both of the Debtors in these Chapter 11 Cases and of Tehum in the Texas Bankruptcy Case. Movants respectfully suggest that those creditors whose obligations arose after the 2022 divisional merger will benefit as much as longer-standing creditors from the Texas Bankruptcy Court's knowledge of the Debtors' business and the personalities of the Debtors' principals and other key parties.

7.      While the Movants are certain that this Court would handle these cases with the efficiency and fairness this Court affords to all debtors, transferring these Chapter 11 Cases to the

4

Southern District of Texas will promote the efficient administration of the Debtors' estates, serve the interest of justice, and prevent the Debtors from using the bankruptcy process to circumvent their obligations and evade the jurisdiction that has presided over these matters from their inception. The Debtors should not be permitted to forum-shop their way out of accountability.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over this matter generally pursuant to Sections 157 and 1334 of title 11 of the United States Code (the "Bankruptcy Code"). This is a core proceeding under 28 U.S.C. § 157(b). *See In re Campbell*, 242 B.R. 740, 744 (Bankr. M.D. Fla. 1999) ("Proper venue is a core proceeding in a Title 11 case because it involves fundamental bankruptcy issues, including, in Chapter 11 cases, a determination of whether a requested transfer would promote the economic and efficient administration of the estate." (internal citations omitted)). Venue is proper under 28 U.S.C. § 1409.

9.     The statutory predicates for the relief requested herein are 28 U.S.C. §§ 1404, 1408, and 1412 and Rule 1014(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## RELIEF REQUESTED

10.     Movants request entry of an Order, substantially in the form attached hereto as **Exhibit A**, transferring the Debtors' Chapter 11 Cases to the United States Bankruptcy Court for the Southern District of Texas, Houston Division, pursuant to Bankruptcy Rule 1014 and 28 U.S.C. §§ 1408 and 1412.

## BACKGROUND

11.     On May 8, 2026, the Debtors filed these Chapter 11 Cases before the United States Bankruptcy Court for the Middle District of Florida (the "Court").

5

CORE/3533662.0002/242909810.4

12.     The Chapter 11 Cases are jointly administered pursuant to this Court's *Order Granting Debtors' Expedited Ex Parte Motion for Entry of an Order: (I) Directing Joint Administration of Chapter 11 Cases; and (II) Granting Related Relief* [Docket No. 8].

**A.     The Divisional Merger**

13.     These Chapter 11 Cases are deeply intertwined with the Tehum Bankruptcy Case in the United States Bankruptcy Court for the Southern District of Texas. The Debtors are affiliates and successors in interest to Tehum Care Services, Inc. ("Tehum").

14.     Tehum was formerly known as Corizon Health, Inc. ("Corizon"). Corizon was a nationwide provider of correctional healthcare, serving multiple states.  In the ordinary course of business, Corizon entered into agreements with various (typically governmental) entities under which Corizon would provide, or arrange for the provision of, healthcare services to certain inmates or detainees of the contract counterparty.

*a.     Tehum/Corizon's History*

15.     For most of its history, until the mid-2010s, Corizon's business was financially successful.  Near the end of the decade, however, the company began to witness the loss of key contracts and mounting liabilities, largely driven by claims asserted by incarcerated individuals alleging mistreatment or inadequate healthcare.

16.     In early December 2021, Mr. Lefkowitz and other investors in Perigrove 1018, LLC ("Perigrove 1018"), acquired the entire portfolio of Corizon companies from the Flacks Group.

17.     Corizon and its affiliates were structured as a group of affiliated entities, tied together through related-party loans and contracts. Perigrove 1018 and Mr. Lefkowitz operated Corizon as a mere instrumentality, extracting substantial value for themselves while providing inadequate healthcare to inmates and failing to pay third parties.  They commingled assets,

6

including bank accounts, failed to maintain business records, and utilized corporate funds for personal purposes.

18.    Further, Perigrove 1018 and Mr. Lefkowitz diverted Corizon's funds and assets to enrich themselves at the expense of Corizon's operations.  Because of Perigrove 1018's and Mr. Lefkowitz's abuse of the corporate form, Corizon was undercapitalized such that it provided substandard healthcare and was unable to cover its exposure to tort claims.

### b.    Creation of Affiliated Entities

19.    In December 2021, Mr. Lefkowitz directed Corizon to hire Sara Tirschwell as its Chief Executive Officer. Seeking to curtail these mounting risks, Corizon and its owners sought to shield their companies from tort litigation while effectively looting the business.

20.    They ultimately decided to implement a restructuring tactic colloquially referred to as the "Texas Two-Step."  This tactic, which has been used in connection with several high-profile bankruptcies, involves a divisional merger under Texas law in which a subsidiary splits its assets and liabilities between two entities.

21.    One entity—"TortCo"—will house all the subsidiary's tort liabilities.  The other entity—"GoodCo"—will be vested with the subsidiary's productive assets and favored liabilities. TortCo will agree to indemnify the entire non-debtor corporate family for the tort liability and then subsequently file for bankruptcy, permitting TortCo to enjoin all tort liability litigation against all non-debtor affiliates and other indemnified parties.

22.    In late 2021 and early 2022—when Perigrove 1018 and Mr. Lefkowitz were looking to offload Corizon's liabilities—the Texas Two-Step appeared to offer an easy bankruptcy solution. A plan devised by White & Case advised Corizon to separate its "current business and related secured and unsecured liabilities" from its "historical liabilities."

7

23. Current business and favored liabilities would be vested in a new entity named CHS TX, Inc. ("CHS TX"), while the disfavored historical liabilities, including the tort-based claims, would be retained by Corizon. CHS TX would then be acquired by a newly formed entity, YesCare.

24. Under this structure, Corizon would be responsible for managing the disfavored liabilities, while Corizon's existing business and future business opportunities would be funneled to YesCare and its wholly owned subsidiaries.

25. Mr. Lefkowitz and Perigrove 1018 decided to move forward with the proposed transaction, which was designed to hinder, delay, and defraud Corizon's creditors. They did so by implementing the proposed transactions through fraud.

26. On January 31, 2022, YesCare filed a *Certificate of Formation For-Profit Corporation* dated January 26, 2022, with the Texas Secretary of State. See **Exhibit B**, attached hereto. This Certification identified Sara Tirschwell, the then-Chief Executive Officer of Corizon, as YesCare's sole director, and 3411 Yoakum Blvd. #2901, Houston, Texas 77006 (a luxury apartment building in Houston's Montrose and Museum District area), as YesCare's business address and Sara Tirschwell's address.

27. The *2022 Foreign Profit Corporation Annual Report* for Corizon dated April 19, 2022, identifies the following individuals as officers or directors of Corizon: Sara Tirschwell (CEO and Director), Jeffrey F. Sholey (CFO), Scott J. King (SEC), Jennifer Finger (Asst. Secretary), Maya Patel (Asst. Secretary), Tracy Bartoli (Asst. Secretary), Ayodeji Ladele, M.D. (CMO), David Gefner (Director, Chairman), Abe Goldberger (Director, Vice Chairman), Isaac Lefkowitz (Director), and Jay Leitner (Director). *See* **Exhibit C**, attached hereto. This report

8

further identified Corizon's principal place of business as 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

28.     YesCare then formed several operating subsidiaries, including CHS Alabama, LLC, and CHS Arizona, LLC, in the following months.  Each of these entities was a YesCare subsidiary.  Sara Tirschwell, the CEO of Corizon, was listed as the manager for these entities.

29.     Corizon executives, including CEO Sara Tirschwell and CLO Scott King, and others, pitched all new RFPs under the newly formed entities—CHS AL and CHS AZ, LLC ("CHS AZ").  New contracts arising from these efforts resulted in new business being funneled away from Corizon to YesCare.

30.     At this time, YesCare had no employees. Corizon executives pitched the CHS entities as being comprised of Corizon clinical and administrative employees.

31.     On April 6, 2022, Tracy Bartoli, Corizon's Director of Legal Services, sent Jeffrey Scott King, Corizon's Chief Legal Officer, an Excel spreadsheet that identified the newly established CHS entities, such as CHS AZ and CHS AL, as well as several others and planned CHS entities.  See **Exhibit D** and **Exhibit E**, attached hereto. The spreadsheet identified Sara Tirschwell—Corizon's Chief Executive Officer—as the "Member" and "Manager" of the newly established CHS entities.  This activity reflects a concerted, detailed effort by Perigrove 1018, Mr. Lefkowitz, and Corizon's directors and officers to move business opportunities away from Corizon in the lead-up to the divisional merger (discussed below).

32.     A series of additional entities were formed between February 11, 2022, and April 5, 2022, including CHS FL, CHS GA, CHS KS, CHS NH, CHS New Jersey, CHS MO, and CHS NY.  These entities were managed by YesCare and Sara Tirschwell.

CORE/3533662.0002/242909810.4

33. There were also more than a dozen entities listed on an internal document as "To Be Filed," apparently for the purpose of bidding on new contracts in those respective states close to times when such contracts were available for bidding, including: CHS KY, CHS MD, CHS MI, CHS NM, CHS PA, CHS VA, CHS WY. *See* **Exhibit F**, attached hereto.

34. This internal document also identified the states of California, Indiana, Massachusetts, Mississippi, Nevada, and Tennessee as "in pipeline."

35. CHS AZ and possibly other CHS entities were representing themselves as mere continuations of Corizon before the divisional merger.

36. Next, as described below, Perigrove 1018 and Mr. Lefkowitz led the implementation of the Divisional Merger.

37. On April 7, 2022, CHS Care TX, LLC, filed a *Certificate of Formation Limited Liability Company* with the Texas Secretary of State (Filing # 804510271). *See* **Exhibit G**, attached hereto. This Certificate identified YesCare Corp., 3411 Yoakum Blvd., Suite 2901, Houston, Texas 77006, as CHS Care TX, LLC's sole manager, and Sara Tirschwell, 3411 Yoakum Blvd., Suite 2901, Houston, Texas 77006, as CHS Care TX, LLC's sole organizer.

38. On April 28, 2022, Corizon filed a *Certificate of Conversion of a Delaware Corporation to a Texas Corporation*, thereby converting Corizon from a Delaware corporation to a Texas corporation. *See* **Exhibit H**, attached hereto. Jeffrey Scott King, Corizon's Chief Legal Officer, signed this Certificate. Corizon, LLC, a Missouri limited liability company, and Corizon Health of New Jersey, LLC, a New Jersey limited liability company, remained subsidiaries of Corizon as of this date.

39. On April 28, 2022, Valitás Health Services, Inc. filed a *Certificate of Conversion of a Delaware Corporation to a Texas Corporation*, thereby converting Valitás Health Services,

CORE/3533662.0002/242909810.4

Inc. from a Delaware corporation to a Texas corporation. *See* **Exhibit I**, attached hereto. Jeffrey Scott King, Corizon's Chief Legal Officer, signed this Certificate.

40. On May 3, 2022, Corizon filed a *Certificate of Merger Combination Merger Business Organization Code* with the Texas Secretary of State, reflecting the merger of Corizon Health, Inc., Valitás Health Services, Inc., Corizon, LLC, and Corizon Health of New Jersey, LLC, with Corizon Health, Inc. as the surviving entity. *See* **Exhibit J**, attached hereto. Valitás Health Services, Inc., Corizon, LLC, and Corizon Health of New Jersey, LLC did not survive the merger. Jeffrey Scott King, Corizon's Chief Legal Officer, signed this Certificate.

41. The Certificate identified 205 Powell Place, Suite 104, Brentwood, Tennessee 37027 as the principal place of business for all the merger parties, including Corizon, as the surviving entity. Following the merger, Corizon was vested with all assets and liabilities of Corizon, Valitás Health Services, Inc., Corizon, LLC, and Corizon Health of New Jersey, LLC.

    *c. The Divisional Merger*

42. On May 3, 2022, Corizon filed a *Certificate of Merger Domestic Entity Divisional Merger Business Organization Code* with the Texas Secretary of State to form CHS TX pursuant to a plan of merger under Section 3.0006 and Chapter 10 of the Texas Business Organization Code. *See* **Exhibit K**, attached hereto. According to this Certificate, CHS TX's initial directors were Sara Tirschwell, Jeffrey Scott King, and Jeff Sholey. Sara Tirschwell was identified as the Organizer.

43. Along with the divisional merger certificate, Corizon filed a *Certificate of Formation* for CHS TX with the Texas Secretary of State, which along with the divisional merger, became effective on May 5, 2022. *See* **Exhibit L**, attached hereto. On or about May 5, 2022, YesCare appointed Sara Tirschwell as its Chief Executive Officer.

11

44.     On May 11, 2022, the Texas Secretary of State approved and accepted the *Certificate of Merger and Certificate of Formation* for CHS TX, effective as of May 5, 2022. CHS TX was subsequently acquired by YesCare.  *See* **Exhibit M**, attached hereto.

45.     M2 LoanCo, LLC, a related entity to Corizon, and Tehum agreed to a funding agreement (the "Funding Agreement") pursuant to which M2 LoanCo, LLC would pay or cause to be paid funding to Corizon up to an aggregate cap of $15 million for payment of Corizon's costs of operations and certain liabilities that arose prior to the Divisional Merger.

46.     On May 16, 2022, UCC-1 Financing Statements were filed with the Texas Secretary of State identifying YesCare's and CHS TX's mailing address as 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.  *See* **Exhibit N** and **Exhibit O**, attached hereto.

47.     On June 1, 2022, Corizon filed a *Certificate of Amendment with the Texas Secretary of State* and changed its name from Corizon Health, Inc. to Tehum Care Service, Inc.  This Certificate was signed by Isaac Lefkowitz.  *See* **Exhibit P**, attached hereto.

48.     Pursuant to the Divisional Merger, Tehum, formerly Corizon, remained in existence and was allocated and remained vested with all inactive and expired customer contracts, as well as all historical liabilities related to such contracts, as well as extensive tort liabilities.

49.     The purported consideration received by Tehum in the Divisional Merger was the release from its purported secured debt obligations to M2 LoanCo, LLC, which were allocated to CHS TX, $1 million in cash from the Corizon accounts (remaining cash going to the transferees), and the right to draw on the Funding Agreement.

50.     The practical effect of the Divisional Merger was for Corizon to split its assets and liabilities among two entities. Tehum continued to house the disfavored liabilities, including the tort claims asserted by the inmates and their families, as well as liabilities owed to certain vendors

12

and terminated employees.  CHS TX was vested with Corizon's productive assets and its favored liabilities and became a YesCare subsidiary. Upon information and belief, Perigrove 1018's and Mr. Lefkowitz's intent was for YesCare to function as a mere continuation of Corizon.

51.    In connection with the Divisional Merger, Corizon obtained a fairness opinion that was based upon intentionally misleading information.  In order to obtain this opinion, Corizon provided records relating to its operations, bank accounts, and other financials, including accounting and bank records that showed $22.3 million in cash maintained in the Corizon Signature Account.

52.    In reality, that cash had been stolen by Mr. Lefkowitz and his business partners months before and Mr. Lefkowitz forged a bank account as part of his scheme to cover up that fact.

53.    Soon after creating the Signature Accounts, Mr. Lefkowitz began periodically directing Corizon accounting personnel to transfer funds to those accounts from Corizon's existing operating accounts.  When Corizon employees asked questions about the millions of dollars being sent to accounts no one at Corizon could access, Mr. Lefkowitz told them the funds were being held in the Signature Accounts for Corizon's benefit.

54.    Corizon's accounting department kept track of the transfers to the Signature Accounts and, believing the funds remained there and readily available for the company, included those amounts as assets in providing information to its advisors.  But they could not conduct its analysis of the Corizon books and records without some level of verification that the financials were in order and devoid of obvious fraud.  This meant that any summary of company assets held in bank accounts required actual bank statements in order to be verified—a tall order because no

13

one in Corizon's accounting department (or anywhere else at the company) had access to the Signature Accounts or accompanying statements.

55.     Mr. Lefkowitz and the rest of the Tehum ownership group had a problem – their advisors needed to confirm the amounts in the Signature Accounts, but providing the actual account statements would reveal their fraud.  As of February 28, 2022, rather than the $22.3 million the company's accounting department believed remained in the account, the account contained a paltry $12,583.00.[3]  Mr. Lefkowitz stalled, but by late April, as the deadline for the fairness opinion and the planned Divisional Merger date approached, he had to provide evidence of the funds.

56.     Mr. Lefkowitz solved the problem by falsifying a bank statement for the Signature Bank Account.  On April 28, 2022, he provided Corizon employees and advisors with a statement purportedly showing that Corizon had $22,306,821.78 in the Corizon Signature Account as of February 28, 2022.  Three days later, Corizon's CFO sent a Management Representation Letter stating that "[a]s of February 28, 2022, the Company's subsidiary Corizon, LLC held cash of approximately $22.3 million in a bank account that is not subject to a deposit account control agreement in favor of the collateral agent" under the company's existing secured debt, and its advisors referenced this and other less blatant questionable statements of management in its flawed analysis.

57.     Following the Divisional Merger, YesCare operated as a mere continuation of Corizon. YesCare continued to operate the business once operated by Corizon without interruption.  YesCare and CHS TX occupied the same principal place of business as Corizon at 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

---

[3] The Official Committee of Unsecured Creditors appointed in the Tehum Bankruptcy Case obtained the account statements for the Signature Accounts in discovery during the case.

CORE/3533662.0002/242909810.4

58.     There was a continuity of management.  Following the Divisional Merger, in May of 2022, (a) Sara Tirschwell, the former Chief Executive Officer for Corizon, became the Chief Executive Officer for YesCare, (b) Ayodeji Olawale Ladele, the former Executive Vice President and Chief Medical Officer for Corizon, became the Executive Vice President and Chief Medical Officer for YesCare, (c) Beverly Michelle Rice, the former Corporate Controller for Corizon, became the Corporate Controller for YesCare, (d) Jeffrey Scott King, the former Chief Legal Officer at Corizon, became the Executive Vice President and Chief Legal Officer at YesCare, (e) Jennifer Lynne Finger, the former Assistant General Counsel at Corizon, became the Assistant General Counsel at YesCare, and (f) Frank Jeffrey Sholey, the former Chief Financial Officer at Corizon, became the Chief Financial Officer at YesCare, and later assumed the role of Chief Executive Officer for YesCare in February of 2023.

59.     There was a continuity of personnel.  All employees who worked for Corizon prior to the Divisional Merger became employees of YesCare and/or CHS TX.

60.     There was no change to the operating assets or general business operations.  There was no change to postage and packing or contract structures.  To ensure that YesCare continued to receive payments under the existing contracts, YesCare continued to use the same bank accounts as Corizon.  The operations of YesCare were virtually identical to those of Corizon prior to the mergers and the separation of assets from liabilities.

61.     On its website, newly formed YesCare held itself out to the public as "the leading provider of correctional healthcare services in the United States" and as having "over 35 years of history working with local and small businesses."  *See* **Exhibit Q**, attached hereto.

62.     There was a continuity of shareholders.  Perigrove 1018 was the beneficial owner of Corizon prior to the Divisional Merger and became the beneficial owner of YesCare after the

15

Divisional Merger.  At all relevant times prior to the Divisional Merger, Isaac Lefkowitz controlled the operations of Corizon, and at all relevant times after the Divisional Merger, Isaac Lefkowitz controlled the operations of YesCare.

63.     After the Divisional Merger, Tehum commenced a bankruptcy proceeding to liquidate its remaining assets. At the time Tehum declared bankruptcy, it had no employees or ordinary business operations. Upon information and belief, the transactions that resulted in YesCare operating as a mere continuation of Corizon were done with the intent of hindering, delaying, and defrauding Corizon's creditors, including the tort claimants.

**B.     Affiliated Southern District of Texas Bankruptcy Case**

64.     On February 13, 2023, Tehum filed a voluntary petition under Chapter 11 of the Bankruptcy Code before the Texas Bankruptcy Court.

65.     On March 23, 2023, Tehum filed a *Complaint Seeking (I)(A) a Declaratory Judgment that the Automatic Stay Applies to Certain Claims and Causes of Action Asserted Against Certain Non-Debtors and (B) an Extension of the Automatic Stay to Certain Non-Debtors, or in the Alternative, (II) a Preliminary Injunction Related to Such Actions*.  *See* Adv. No. 23-03049 (Bankr. S.D. Tex.), Docket No. 1.

66.     In this Complaint, Tehum took the position that claims asserted against YesCare and/or CHS TX "based on alter ego, veil piercing, successor liability, fraudulent transfer, and/or similar theories" became "property of the [Tehum]'s estate under 11 U.S.C. § 541(a)" when Tehum filed for bankruptcy and that "the pursuit of such claims by a non-debtor is a violation of Bankruptcy Code section 362(a)(3)." *Id.* at ¶ 5. Upon information and belief, Tehum threatened to bring contempt proceedings against attorneys representing claimants if they tried to continue litigation against YesCare and CHS TX based on such theories of liability.  The intended impact

16

of the Tehum Bankruptcy Case was to shut down all litigation against YesCare and CHS TX and shield their assets from Tehum's creditors.

67.     By the petition date, as it had been since the Divisional Merger closed the prior year, Tehum was an empty shell.  However, Tehum still served as a useful vehicle through which Mr. Lefkowitz, Perigrove 1018, YesCare, and CHS TX could seek to obtain releases and shield themselves from liability. Tehum intended to use its bankruptcy case to settle claims that creditors could bring against Mr. Lefkowitz, Perigrove 1018, YesCare, and CHS TX outside of bankruptcy.

    *a.  The Plan Terms, Including the Estate Party Settlement*

68.     The Tehum Bankruptcy Case languished for over two years during which extensive discovery was taken, and the Texas Bankruptcy Court presided over multiple days'-long evidentiary hearings.

69.     A mediation was held on or about May 6, 2024, in New York, New York, with Christopher S. Sontchi, former Chief Judge for the United States Bankruptcy Court for the District of Delaware, Tehum, the Official Committee of Unsecured Creditors, the Tort Claimant Committee, Mr. Lefkowitz, Perigrove 1018, YesCare, and CHS TX reached an agreement regarding the terms of a consensual plan. *See First Modified Joint Chapter 11 Plan of Reorganization of the Tort Claimants' Committee, Official Committee of Unsecured Creditors, and Debtor* [Tehum Bankruptcy Case, Docket No. 2014, Ex. B].[4] The Plan was confirmed on March 3, 2025 [Tehum Bankruptcy Case, Docket No. 2014].

70.     Pursuant to Article XII.A of the Plan, the Texas Bankruptcy Court retained "exclusive jurisdiction over all matters arising out of, or related to," the Tehum Bankruptcy Case and the Plan for, among other things, jurisdiction to "adjudicate, decide, or resolve any and all

_____

[4] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

17

matters related to the Plan (including the Estate Party Settlement); [and] resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, implementation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under all settlements (including the Estate Party Settlement), agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order."

71.     Article IV.B.1 of the Plan provides that the Settlement Parties[5] shall pay or cause to be paid to the PI/WD Trust and GUC Trust (the "Trusts"), as applicable, aggregate Cash in the amount of Fifty Million Dollars ($50,000,000.00), as follows: (i) on or before the Effective Date, the Settlement Parties shall pay or cause to be paid to Tehum's estate Cash in the amount of Two Million Dollars ($2,000,000.00) which shall be contributed to the PI/WD Trust and the GUC Trust on the Effective Date; and (ii) the remaining Forty-Eight Million Dollars ($48,000,000.00) shall be paid over thirty (30) months with interest at 6.00% per annum on the unpaid balance, with each installment payment being due on the fifteenth (15th) day of each month (or, if such day is not a Business Day, the next succeeding Business Day) until all Installment Settlement Payments have been made, with the final installment being made no later than thirty (30) months after the Effective Date (or, if such day is not a Business Day, the next succeeding Business Day).

72.     Exhibit D to the Plan Supplement (filed on February 7, 2025), set forth the payment schedule for the Settlement Payment, and reflected the initial payment of Two Million Dollars

---

[5] "Settlement Parties" include the Debtors:

"'*Settlement Parties*' or '*Settling Parties*' means, collectively, YesCare Corp., its wholly owned subsidiaries (including CHS TX, Inc.); Geneva Consulting, LLC; Perigrove 1018, LLC; Perigrove, LLC; M2 HoldCo, LLC; M2 LoanCo, LLC; and PharmaCorr LLC" Plan, Article I.A.182.

($2,000,000.00) and each of the Installment Settlement Payments (with accrued interest). *See* Tehum Bankruptcy Case, Docket No. 1955-4 (the "Settlement Payment Schedule").

73. Under the Plan, the Trusts would then make distributions to claimants using the Settlement Payments. Article III of the Plan makes it clear that Holders of Allowed Channeled Claims are entitled to receive a distribution from the Trust Assets, and the Settlement Payments are Trust Assets intended to facilitate distributions to claimants.

74. Released Parties, which include the Settlement Parties, cannot get the benefit of the release unless the settlement payments are made in accordance with the Plan. Further, under the Plan, the Estate Causes of Action against the Released Parties are transferred to the Trusts and can be prosecuted by the Trusts following a payment default. Thus, under the Plan, the Settlement Parties must either make the required payments or face litigation.

75. Under the Plan, the Channeling Injunction is the only injunction that goes into effect on the Effective Date, which injunction was designed to serve as a bridge between the Effective Date and the Final Payment Date. The Channeling Injunction offers the Released Parties various protections. But those protections fall away if a payment default is declared and such default is not cured or waived within five business days. *See* Plan at Article IX.I.5.

76. If the Channeling Injunction terminated, the Trusts would then have 90 days to commence or revive litigation against the Released Parties. *See* Plan at Article IV.B.2 & Article IX.I.6. Again, the purpose of these Plan provisions was clear: if the Settlement Parties defaulted, then the Trusts would bring the Causes of Action.

77. On November 13, 2024, the Texas Bankruptcy Court entered the *Order (I) Approving Disclosure Statement and Form and Manner of Notice of Hearing Thereon, (II) Establishing Solicitation Procedures, (III) Approving Form and Manner of Notice to Claim*

19

*Holders, (IV) Approving Form of Ballots, (V) Approving Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan, and (VII) Granting Related Relief. See* Tehum Bankruptcy Case, Docket No. 1813.

78.   On March 3, 2025, the Bankruptcy Court entered *the Order Confirming the First Modified Joint Chapter 11 Plan of Reorganization of the Tort Claimants' Committee, Official Committee of Unsecured Creditors, and Debtor. See* Tehum Bankruptcy Case, Docket No. 2014.

79.   Paragraph 42 of the Confirmation Order provides:  "All Statute of Limitations for all Claims and Causes of Action against the Released Parties held by the Debtor, the Estate, the PI/WD Trust, the GUC Trust, and Holders of Channeled Claims shall be tolled and extended to the first Business Day that is ninety (90) days after the termination of the Channeling Injunction as provided in Article IV.B.2 of the Plan."

80.   On March 31, 2025, the Plan became effective, and the PI/WD Trust and the GUC Trust were established pursuant to the terms of the Confirmation Order and the Plan as set forth in the *Notice of Entry of (I) Confirmation Order, (II) Occurrence of Effective Date, (III) Administrative Claims Bar Date, and (IV) Other Claims Deadlines. See* Tehum Bankruptcy Case, Docket No. 2088.  Under the Plan, "Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), is deemed to occur on the Effective Date.  *See* Plan, Article X.D.

## C.   Settlement Payment Default and Corresponding Litigation

81.   After the Effective Date, the Settlement Parties began to make the required payments. During the timeframe between April 11, 2025 and August 21, 2025, the Settlement Parties made the following payments totaling $13,607,500.00 to the Trusts that were applied to the Settlement Payment:  $2,000,000.00 paid on April 11, 2025; $240,000.00 paid on May 5, 2025;

20

$3,740,000.00 paid on May 14, 2025; $3,222,500.00 paid on June 24, 2025; $2,207,500.00 paid on July 16, 2025; and $2,197,500.00 paid on August 21, 2025.

82.     After making the initial payments, the Settlement Parties failed to make the required payments in full due on or after August 15, 2025.  On January 26, 2026, the Trusts filed the *Notice of Settlement Payment Default and Settlement Payment Default Cure Notice. See* Tehum Bankruptcy Case, Docket No. 2591.  By this notice, the Trusts asserted that the Settlement Parties failed to make the Installment Settlement Payments due on September 15, 2025, October 15, 2025, November 15, 2025, December 15, 2025, and January 15, 2026.

83.     During these months, the Settlement Payment Schedule required principal payments of $7,500,000.00 plus scheduled interest of $850,000.00, for a total of $8,350,000.00.

84.     The Settlement Parties ultimately acknowledged that they had failed to fully cure the missed Installment Settlement Payment due on August 15, 2025, and they failed to make the Installment Settlement Payments due on September 15, 2025, October 15, 2025, November 15, 2025, December 15, 2025, and January 15, 2026 (collectively, the "Designated Defaults").

85.     On February 1, 2026, to provide the Settlement Parties with the opportunity to cure the Designated Defaults, the Trusts entered into a Cure Agreement with YesCare and its wholly owned subsidiaries (including CHS TX), Geneva, Perigrove 1018, Perigrove, M2 HoldCo, M2 LoanCo, and PharmaCorr.  *See* Tehum Bankruptcy Case, Docket No. 2602 at Ex. A (the "Cure Agreement").

86.     Section 11 of the Cure Agreement provides that the Cure Agreement "shall be deemed to be made in the State of Texas and shall be interpreted in accordance with the laws of the State of Texas, without regard to conflict of law principles," and that "[b]y executing this Agreement, the Settlement Parties agree that in the event litigation arises between the Parties in

21

connection with this Agreement, the Settlement Parties consent to the jurisdiction and venue before the [Texas] Bankruptcy Court."

87. The Settlement Parties duly tendered the initial payment of $2.3 million required by the Cure Agreement. However, they defaulted again almost immediately and failed to make the Installment Settlement Payment due on February 17, 2026, in the amount of $2,012,022.75.

88. As a result, on February 25, 2026, the Trusts filed the *Notice of Settlement Payment Default and Settlement Payment Default Cure Notice* and provided written notice to the Settlement Parties' counsel in accordance with the Plan that the Settlement Parties failed to make the Installment Settlement Payment due on February 17, 2026, in the amount of $2,012,022.75. *See* Tehum Bankruptcy Case, Docket Nos. 2602-1 & 1955-4. Pursuant to this notice and the Plan, the Settlement Parties were required to cure the default by Wednesday, March 4, 2026. The Settlement Parties did not make the missed Installment Settlement Payment by this deadline.

89. As a result, on March 4, 2026, the Trusts filed the *Notice of Failure to Cure Settlement Payment Default; Automatic Termination of Channeling Injunction; and Deadline to Commence Causes of Action Against Released Parties*. See Tehum Bankruptcy Case, Docket No. 2617.

90. Pursuant to the Confirmation Order and the Plan, the Channeling Injunction terminated, and all Statute of Limitations for all Claims and Causes of Action against the Released Parties held by the Plaintiffs were extended to the first Business Day that is ninety (90) days after the termination of the Channeling Injunction, or June 3, 2026.

91. On April 27, 2026, the GUC Trustee, Michael Zimmerman, solely in his capacity as the PI/WD Trustee of the PI/WD Trust, and the Post-Effective Date Debtor filed a Complaint with the Texas Bankruptcy Court against Isaac Lefkowitz, YesCare, CHS TX, Perigrove 1018,

22

and various other Settlement Parties and their affiliates for various estate causes of action in connection with the Divisional Merger, including, but not limited to, actual fraud, constructive fraud, breach of fiduciary duty, and alter ego and successor liability (the "Adversary Complaint"). *See* Case No. 26-03138 (Bankr. S.D. Tex.) (the "Adversary Proceeding"). A true and correct copy of the Adversary Complaint is attached hereto as **Exhibit R**.

**D.      The Chapter 11 Cases and Lack of Relationship to the Middle District of Florida**

92.      On May 8, 2026, the Debtors filed these Chapter 11 Cases with this Court, seeking to stay the Adversary Proceeding and to avoid the consequences of failing to make the required Settlement Payments under the Plan. However, the Debtors fail to establish a sufficient connection to the Middle District of Florida.

93.      According to the Florida Secretary of State, CHS FL is a Florida limited liability company, the sole member and manager is YesCare, and principal place of business is 205 Powell Place, Suite 104, Brentwood, Tennessee 37027. A copy of CHS FL's 2026 Florida Limited Liability Company Annual Report is attached hereto as **Exhibit S**. CHS FL's sole managing member is YesCare.

94.      YesCare is a corporation duly organized and validly existing under the laws of the State of Texas, with a principal place of business of 205 Powell Place, Suite 104, Brentwood, Tennessee 37027. *See* YesCare Voluntary Petition [Case No. 26-01089, Docket No. 1]. YesCare is not registered to do business in the State of Florida.

95.      CHS TX is a corporation duly organized and validly existing under the laws of the State of Texas, with a principal place of business of 205 Powell Place, Suite 104, Brentwood, Tennessee 37027. *See* CHS TX Voluntary Petition [Case No. 26-01090, Docket No. 1]. CHS TX is registered to do business in the State of Florida.

CORE/3533662.0002/242909810.4

96.     CHS AL is an Alabama limited liability company with a principal place of business of 205 Powell Place, Suite 104, Brentwood, Tennessee 37027. *See* CHS AL Voluntary Petition [Case No. 26-01091, Docket No. 1]. CHS AL is not registered to do business in the State of Florida.

97.     While a list of creditors has not been filed by the Debtors, the notice lists included in each of the Debtors' voluntary petitions, which each contain nearly 1,000 parties, only include roughly 200 parties located in the State of Florida each. Further, based on Movants' review of the notice lists, neither Tehum, the Trusts, nor Movants are listed as notice parties.

98.     As discussed prior, pursuant to the confirmed Plan, the Texas Bankruptcy Court retained exclusive jurisdiction over all matters arising out of, or related to, the Tehum Bankruptcy Case and the Plan for, among other things, jurisdiction to "adjudicate, decide, or resolve any and all matters related to the Plan (including the Estate Party Settlement); [and] resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, implementation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under all settlements (including the Estate Party Settlement), agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order." Plan, Article XII.A.

99.     The Debtors have not provided any valid or appropriate basis to support their choice of venue in the Middle District of Florida. None of the Debtors' principal places of business are in the Middle District of Florida and YesCare and CHS AL are not registered to do business in the State of Florida. The only connection appears to be that CHS FL was formed in the State of Florida.

24

E.   **Another Potential Mere Continuation of Corizon / YesCare – Correct Health Services, LLC**

100.   YesCare lists Correct Health Services, LLC ("Correct Health") as its sole managing member. *See* YesCare Voluntary Petition, List of Equity Security Holders [Case No. 26-01089, Docket No. 1].

101.   Isaac Lefkowitz holds himself out to be the Chief Executive Officer of Correct Health.

102.   Upon information and belief, Mr. Lefkowitz intends to use Correct Health to continue the business operations of Corizon/YesCare by bidding on new contracts in the name of Correct Health and utilizing the employees and infrastructure of YesCare to divert assets and corporate opportunities to Correct Health while leaving all the liabilities with the Debtors.

## BASIS FOR RELIEF

A.   **Venue is Improper Pursuant to 28 U.S.C. § 1408**

103.   Under 28 U.S.C. § 1408, there are two bases for establishing venue in a bankruptcy case. First, a case under title 11 may be brought in the district court for the district in which the domicile, residence, principal place of business, or principal assets of the person filing have been located for the 180 days immediately preceding the filing of the case or for a longer portion of that 180 day-period than the domicile, residence, principal place of business, or principal assets of such person were located in any other district. 28 U.S.C. § 1408(1).

104.   Second, a case under title 11 may be brought in the district court for the district in which there is a case pending under title 11 by an affiliate, general partner or partnership of the person filing. 28 U.S.C. § 1408(2).

105.   Neither of these qualifications under 28 U.S.C. § 1408 are present in these Chapter 11 Cases. The Debtors are not located in the Middle District of Florida, do not have any meaningful

25

contacts in the Middle District of Florida, and affirmatively state in their own voluntary petitions that their principal places of business are in Tennessee. YesCare is a Texas corporation. CHS TX is a Texas corporation. CHS AL is an Alabama limited liability company. Neither YesCare nor CHS AL are even registered to do business in Florida. The sole thread connecting these cases to this District is CHS FL's state of formation—a Florida limited liability company whose sole managing member is YesCare, a Texas entity headquartered in Tennessee. And prior to the filing, the extensively affiliated Tehum Bankruptcy Case has been pending in the Southern District of Texas since February 2023, and the Adversary Proceeding—asserting claims of actual fraud, constructive fraud, breach of fiduciary duty, and alter ego and successor liability against these very Debtors—is pending before the Texas Bankruptcy Court. Pursuant to the confirmed Plan, the Texas Bankruptcy Court retained exclusive jurisdiction over all matters arising out of, or related to, the Plan and the Estate Party Settlement, the very issues that drove the Debtors to file these Chapter 11 Cases. The Debtors' selection of this forum is not merely improper—it is a transparent attempt to forum-shop away from the court that knows their history and evade the consequences of their own defaults.

106. Pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014(a)(2), if a case is filed in an improper district, the case may be dismissed or transferred to any other district if the court determines the transfer to be in the interest of justice. Here, transfer is not merely appropriate—it is compelled by the circumstances.

107. The decision to transfer venue under Section 1412 is a matter of the Court's discretion. *Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990). The "interest of justice" prong of section 1412 "is a broad and flexible standard that is applied based on the facts and circumstances of each case."

CORE/3533662.0002/242909810.4

*In re Enron Corp.*, 274 B.R. 327, 349 (Bankr. S.D.N.Y. 2002). This "interest of justice" standard addresses whether a change in venue would "promote the efficient administration of the bankruptcy estate, judicial economy, timeliness and fairness." *In re Blumeyer*, 224 B.R. 218, 220 (Bankr. M.D. Fla. 1998) (quoting *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 149 B.R. 365 (Bankr. S.D.N.Y. 1993)).

108.    Here, the case for transfer is overwhelming. The Debtors have no legitimate connection to the Middle District of Florida. Their operations are headquartered in Tennessee, their corporate formation and the Divisional Merger were effectuated in Texas, and the entire three-year history of the Tehum Bankruptcy Case—including extensive discovery, multiple evidentiary hearings, mediation, plan confirmation, and the now-pending Adversary Proceeding— unfolded before the Texas Bankruptcy Court. That court has developed an unparalleled institutional familiarity with the parties, the fraudulent Divisional Merger, the Settlement Payment structure, and the defaults that precipitated the current dispute. Requiring the Texas Bankruptcy Court's work to be relitigated in this District would be a waste of judicial resources and would reward the Debtors' transparently improper forum selection. The interest of justice and judicial economy demand transfer.

109.    Furthermore, the timing of these filings eliminates any doubt as to the Debtors' true motive. On April 27, 2026, the GUC Trustee, the PI/WD Trustee, and the Post-Effective Date Debtor filed the Adversary Complaint. Just eleven days later the Debtors fled to this Court. The Debtors did not file these Chapter 11 Cases because they need this Court's protection; they filed to invoke the automatic stay as a litigation weapon to obstruct the prosecution of claims in the forum that has jurisdiction over them. This Court should not permit itself to be used as a shield for the Debtors' bad-faith litigation tactics.

27

110.    Moreover, the Debtors have already consented to the jurisdiction of the Texas Bankruptcy Court. Section 11 of the Cure Agreement—executed by YesCare and its wholly owned subsidiaries (including CHS TX), Perigrove 1018, and other Settlement Parties on February 1, 2026—expressly provides that the Cure Agreement "shall be deemed to be made in the State of Texas and shall be interpreted in accordance with the laws of the State of Texas" and that "in the event litigation arises between the Parties in connection with this Agreement, the Settlement Parties consent to the jurisdiction and venue before the [Texas] Bankruptcy Court." The Debtors cannot execute a binding consent to Texas jurisdiction and then, weeks later, flee to Florida to avoid the consequences of their own defaults under that very agreement.

**B.    In the Alternative, These Chapter 11 Cases Should be Transferred in the Interest of Justice and for the Convenience of the Parties to the Southern District of Texas under 28 U.S.C. §§ 1404(a) and 1412 and Bankruptcy Rule 1014(a)(1)**

111.    In the alternative, even if this Court were to find that venue is technically proper solely on the basis of CHS FL's state of formation, the interest of justice and convenience of the parties overwhelmingly require transfer of these Chapter 11 Cases to the Southern District of Texas pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014(a)(1).

112.    Under 28 U.S.C. § 1412, "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." *See also* 28 U.S.C. § 1404(a) ("[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.").

113.    The "interest of justice" standard addresses whether a change in venue would "promote the efficient administration of the bankruptcy estate, judicial economy, timeliness and fairness." *Blumeyer*, 224 B.R. at 220 (internal citation omitted).

28

114. Factors the Court may consider in determining whether to transfer a case pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014(a)(1) are:

    i. The proximity of creditors of every kind to the Court;

    ii. The proximity of the debtors to the Court;

    iii. The proximity of witnesses necessary to the administration of the case;

    iv. The location of the assets;

    v. The economic administration of the estate; and

    vi. The necessity for ancillary administration if bankruptcy should result in a liquidation.

*In re Blumeyer*, 224 B.R. at 220-21 (transferring the debtor's bankruptcy case pursuant to 28 U.S.C. § 1412 from the Middle District of Florida to the Eastern District of Missouri when more than half of the debtor's creditors were located outside of Florida, the debtor's spouse had filed and the debtor's assets were located in Missouri, and the Eastern District of Missouri was familiar with the background of the debtor's case); *see also Campbell*, 242 B.R. at 746.

115. The decision to transfer venue is discretionary and "the moving party has the burden to establish by a preponderance of evidence." *Burlingame v. Whilden (Matter of Whilden)*, 67 B.R. 40, 42 (Bankr. M.D. Fla. 1986).

116. The *Blumeyer* factors weigh heavily in favor of transfer. First, pursuant to the Debtors' own notice lists, approximately 75% of creditors and parties in interest are located outside the State of Florida. Only roughly 200 of nearly 1,000 noticed parties are in Florida, and neither Tehum, the Trusts, nor Movants were even listed as notice parties—a telling omission given that the Adversary Proceeding precipitated these Chapter 11 Cases. Second, the Debtors themselves are not in close proximity to this Court. Every single Debtor identifies 205 Powell Place, Suite

CORE/3533662.0002/242909810.4

104, Brentwood, Tennessee 37027 as its principal place of business. While the Debtors have retained local counsel in this District, their lead counsel is Polsinelli PC, located in New York, New York, not Florida.

117.    Third, the witnesses and key parties who will be required to testify are not located in the Middle District of Florida. Upon information and belief, David Goldwasser, the Debtors' Chief Restructuring Officer, is located in New York and South Florida. *See* David Goldwasser LinkedIn as of May 9, 2026, **Exhibit T**. Isaac Lefkowitz—the individual who orchestrated the fraudulent Divisional Merger, forged the Signature Bank statement to deceive Corizon's advisors and accounting department, and who, upon information and belief, now serves as CEO of Correct Health—is located in Brooklyn, New York.

118.    Fourth, the Debtors' assets are not concentrated in this District. While the Debtors have yet to file schedules, each Debtor's principal place of business is in Tennessee, and their business—contracting with various governmental agencies across the country—means their assets are dispersed nationally, with no particular concentration in the Middle District of Florida.

119.    Fifth, the economic and efficient administration of the estates compels transfer. Administering these cases in this District would require the approximately 80% of creditors located outside Florida, the Debtors' own key principals (Mr. Lefkowitz in New York, Mr. Goldwasser in New York), lead counsel (Polsinelli PC in New York), and the Movants to travel to Fort Myers— a forum selected by the Debtors for no reason other than to distance themselves from the Texas Bankruptcy Court. By contrast, the Southern District of Texas is the natural and efficient forum: it is where the Tehum Bankruptcy Case has been administered for over three years, where the Adversary Proceeding is pending, where the majority of the Debtors' creditors have already retained counsel, and where the vast institutional knowledge of these parties and their disputes

CORE/3533662.0002/242909810.4

resides. All parties additionally will benefit from the knowledge and experience of the United States Trustee for Region 7 and that of the staff, given their extensive participation in the Texas Bankruptcy Case.

120.    The *only* link to Florida is CHS FL's state of incorporation—a hollow formality for an entity whose sole managing member is a Texas corporation headquartered in Tennessee. This single, attenuated factor cannot overcome the avalanche of considerations favoring transfer. To permit the Debtors to anchor these cases in this District based on nothing more than a state-of-formation technicality would reward forum shopping and would undermine the integrity of the bankruptcy process.

121.    As in *Blumeyer*, the connections to the transferee district are overwhelming and transfer of venue is unquestionably in the best interest of the Debtors' estates and creditors. The Texas Bankruptcy Court has presided over the Tehum Bankruptcy Case for more than three years, conducted extensive discovery and multiple days of evidentiary hearings, confirmed the Plan, and is now overseeing the Adversary Proceeding—which asserts claims of actual fraud, constructive fraud, breach of fiduciary duty, and alter ego and successor liability against these very Debtors arising from the Divisional Merger. The factual and legal issues in these Chapter 11 Cases are inextricably intertwined with the Tehum Bankruptcy Case and the Adversary Proceeding. Judicial economy alone demands that a single court—the Texas Bankruptcy Court—preside over all related proceedings. Splitting these proceedings across two courts would generate unnecessary duplication, increase costs to all parties, and risk inconsistent rulings on the same issues. Under any analysis, the Southern District of Texas is the only appropriate forum for these Chapter 11 Cases.

CORE/3533662.0002/242909810.4

122.     Finally, the Plan's exclusive jurisdiction provision and the Debtors' own consent to Texas jurisdiction should prevent the Debtors from arguing for retention of the case in Florida. Article XII.A of the confirmed Plan expressly vests the Texas Bankruptcy Court with exclusive jurisdiction over "all matters arising out of, or related to" the Tehum Bankruptcy Case and the Plan, including jurisdiction to "adjudicate, decide, or resolve any and all matters related to the Plan (including the Estate Party Settlement)" and to "resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, implementation, interpretation, or enforcement of the Plan." The Cure Agreement, executed by the Debtors themselves, independently confirms their consent to Texas jurisdiction and venue. The Debtors cannot simultaneously default on their Plan obligations, consent to Texas jurisdiction, and then seek refuge in a distant forum that has no familiarity with these disputes.

120.     Moreover, the specter of yet another fraudulent transaction underscores the urgency of transfer. Upon information and belief, the Debtors plan to execute or have already executed a transaction with Correct Health Services, LLC—an entity whose sole managing member is listed as YesCare's equity holder—that strips assets from the Debtors and leaves creditors with an empty shell. The Debtors should not be allowed to use this Court as a shield to permit their latest scheme to hinder, delay, and defraud creditors. The Texas Bankruptcy Court, which has spent three years investigating and adjudicating the original Divisional Merger fraud, is uniquely positioned to oversee these estates and prevent further dissipation of assets to the detriment of creditors.

WHEREFORE, Movants respectfully request that this Court enter an order transferring the Debtors' Chapter 11 Cases to the United States Bankruptcy Court for the Southern District of Texas, pursuant to 28 U.S.C. §§ 1408 and 1412, and Bankruptcy Rule 1014(a).

CORE/3533662.0002/242909810.4

Dated: May 10, 2026.

Respectfully submitted,

**STINSON LLP**

By: /s/ *Marc R. Weintraub*
Marc R. Weintraub (Florida Bar No. 119976)
100 South Ashley Dr.
Tampa, FL 33602
Telephone: (813) 534-7550
Facsimile:   (813) 534-7336
Email:   marc.weintraub@stinson.com

-and-

Nicholas Zluticky (*pro hac vice* forthcoming)
Zachary Hemenway (*pro hac vice* forthcoming)
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile:   (816) 691-3495
Email:   nicholas.zluticky@stinson.com
            zachary.hemenway@stinson.com

*Counsel for the GUC Trustee and*
*Wind-Down Officer*

33

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on May 10, 2026, the foregoing document was electronically filed with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

*/s/ Marc R. Weintraub*
Marc R. Weintraub
Florida Bar No. 119976

CORE/3533662.0002/242909810.4